**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MARK ANTHONY SELESTAN** | **CIVIL ACTION** |
| **VERSUS** | **NO.  13-6468** |
| **M. GUSMAN** | **SECTION "H"(4)** |

**REPORT AND RECOMMENDATION**

This matter was referred to a United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to **28 U.S.C. § 636(b)(1)(B) and (C) and § 1915A**, and as applicable, **42 U.S.C. § 1997e(c)(1) and (2)**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.

I.    **Factual and Procedural Background**

    A.    **Original Complaint**

The plaintiff, Mark Anthony Selestan ("Selestan"), was an inmate housed in the Orleans Parish Prison system ("OPP") at the time of the filing of this *pro se* and *in forma pauperis* complaint pursuant to 42 U.S.C. § 1983.  He has since been released from prison.[1]  Selestan filed the complaint against the defendant, Orleans Parish Sheriff Marlin N. Gusman, seeking monetary compensation for alleged inadequate medical care and unsanitary conditions at the prison.

Under a broad reading, Selestan alleged that on September 22, 2013, he slipped and fell as a result of condensation on the floor of Tent 3 where he was housed.  He alleged that the water accumulated as a result of steam from the showers and dampness in the air as a result of the

---

[1]Rec. Doc. No. 8.

malfunctioning air conditioning system.  He further alleged that he did not receive needed pain medication or pain medication adequate to ease his back pain caused by the fall.

Selestan also alleges that the dusty and damp environment in the prison caused him to suffer with sinus issues.  He also complained that the air filters were not changed on a regular basis which contributed to his sinus problems.  He further claims that flying insects were common in the sleeping areas as a result of raw sewerage that leaked on the bathroom floors and which had "leeches" crawling in the filthy water.

**B.**     **Amended Complaint**

Selestan filed an amended complaint in which he claims that he began complaining about the failure to change the air filters in June of 2013.  As a result of the dusty, unfiltered air, he began to suffer with sinus trouble, burning eyes and sinus pressure headaches.  He was prescribed claritin and ibuprofen but several of his sick call complaints went unanswered.

He also claims that he filed several grievance complaints about the raw sewerage in Tent 3, where he was housed.  He complained to prison officials that the inmates were forced to stand in the water during roll call and then tracked it throughout the tent.  He also saw leeches and other insects in the water on the floor in the bathroom.  The insects flew around the inmates while they used the bathroom and while they ate their meals.  He alleges that the deputies were advised and grievance complaints were written to no avail.

Selestan further complained that he was housed with inmates who had contagious diseases, like HIV and tuberculosis, as well as inmates who were detoxing and going through withdrawals.  He added that the inmates in Tent 3 were not taken outside for fresh air and exercise three times a

week for one hour as they were required to do.  When questioned about this, he was told that the yard was under construction.

He also claimed that on September 22, 2013, the maintenance personnel turned off the air unit to do maintenance and failed to turn the system back on for three days.  The inmates were left to suffer in the heat and steam from the showers.  This is when the floors became slippery and he fell.  The deputy known as "Ms. B" or "Bernice" would not open the door to help ventilation because of the security risks.

He further complained that, on one occasion, Security Investigation Division ("SID") officers entered the tent to do a shakedown armed with shotguns and tear gas and strip searched the inmates.  Selestan questioned why they were armed and the deputy told him it was necessary for their protection since there were 10 deputies and 87 inmates.

Finally, Selestan alleged that he was illegally held beyond his proper release date.  He claims he was given a sentence of probation to be released before Thanksgiving of 2014 and was held until a few days before Christmas of 2014.

### C.   Status Conference

On April 1, 2014, the Court held a conference with Selestan and counsel for the defendant to discuss the status of the case since Selestan's release from prison.[2]  Pursuant to the discussions with the parties, the Court directed counsel for the defendant to provide the Court and Selestan with copies of Selestan's requests for service/grievance complaints and his medical records.  Counsel also provided the Court with copies of the deputies' tier log books from Tent 3 from September 1, 2013 through December 29, 2013.  These records have been considered within this Report and are

---

[2]Rec. Doc. No. 11.

separately filed into the record under seal.  *See Gobert v. Caldwell*, 463 F.3d 339, 347 n.24 (5th Cir. 2006) ("'[m]edical records of sick calls, examinations, diagnoses, and medications may [be used to] rebut an inmate's allegations of deliberate indifference.'") (quoting *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

## II.    Standards of Review Frivolousness

Pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A and 42 U.S.C. § 1997e(c), the Court is required to *sua sponte* dismiss cases filed by prisoners proceeding *in forma pauperis* upon a determination that they are frivolous.  The Court has broad discretion in determining the frivolous nature of the complaint.  *See Cay v. Estelle*, 789 F.2d 318 (5th Cir. 1986), *modified on other grounds*, *Booker v. Koonce*, 2 F.3d 114 (5th Cir. 1993).  However, the Court may not *sua sponte* dismiss an action merely because of questionable legal theories or unlikely factual allegations in the complaint.

Under this statute, a claim is frivolous only when it lacks an arguable basis either in law or in fact. *Neitzke v. Williams*, 490 U.S. 319 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998). A claim lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.  *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999).  It lacks an arguable factual basis only if the facts alleged are "clearly baseless," a category encompassing fanciful, fantastic, and delusional allegations. *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992); *Neitzke*, 490 U.S. at 327-28. Therefore, the Court must determine whether the plaintiff's claims are based on an indisputably meritless legal theory or clearly baseless factual allegations. *Reeves v. Collins*, 27 F.3d 174, 176

(5th Cir. 1994); *see Jackson v. Vannoy*, 49 F.3d 175, 176-77 (5th Cir. 1995); *Moore v. Mabus*, 976 F.2d 268, 269 (5th Cir. 1992).

## III.   Analysis

### A.   Sheriff Marlin N. Gusman

Under a broad reading, Selestan named Sheriff Gusman in his role as administrator over the jail and employees and as a party responsible for the overall condition of the jail.  Although Selestan alleges that he wrote grievances he intended to go to the Sheriff, he has not indicated that Sheriff Gusman had any personal knowledge of the conditions to which he was exposed or the medical care he received.

To recover under § 1983, a plaintiff must identify both the constitutional violation and the responsible person acting under color of state law.  *See Flagg Bros*., *Inc. v. Brooks*, 436 U.S. 149, 156 (1978); *Polk County v. Dodson,* 454 U.S. 312 (1981).  Proof of an individual defendant's personal involvement in the alleged wrong is, of course, a prerequisite to liability on a claim for damages under §1983.  Thus, a supervisory official, like Sheriff Gusman, cannot be held liable pursuant to § 1983 under any theory of *respondeat superior* or simply because an employee or subordinate allegedly violated the plaintiff's constitutional rights.  *See Alton v. Tex. A&M Univ.*, 168 F.3d 196, 200 (5th Cir. 1999);  *see also*, *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or respondeat superior liability.").  Sheriff Gusman only would be liable under § 1983 if he were "personally involved in the acts causing the deprivation of his constitutional rights or a causal connection exists between an act of the official and the alleged constitutional violation."  *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir.1981); *see also*, *Watson v. Interstate Fire & Casualty Co.*, 611 F.2d 120, 123 (5th Cir. 1980).

Selestan does not allege and in fact denies that Gusman was personally involved in his medical care.  He also has not alleged that he has suffered any injury as a result of any directive, training, or other policy implemented by Sheriff Gusman that would create a vicarious liability under § 1983.  *See  Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992); *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 1991); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987); *see also*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-25 (1988).

Selestan  also has not alleged a personal connection or action that would render Sheriff Gusman liable for the actions or inactions of his subordinates under § 1983.  The Court has perused the numerous requests for service submitted by Selestan and related to the claims raised in this petition.  These requests for service were forwarded to and addressed by several different Sheriff's Office personnel and none were responded to by the Sheriff himself.  The records also do not indicate that Selestan sought review of any of the requests for service that were deemed grievable.  As will be discussed later in this Report, the Sheriff's personnel ultimately responded to each of Selestan's requests and each of his complaints was addressed in due course.  He therefore has not established a constitutional violation or any act in which Sheriff Gusman was personally involved.

For these reasons, Selestan's claims against Sheriff Gusman as the supervisory official over the prison are frivolous and otherwise fail to state a claim for which relief can be granted pursuant to 28 U.S.C. § 1915(e) and § 1915A, and 42 U.S.C. § 1997e.

**B.**      **Conditions of Confinement**

Even if Selestan could identify a proper defendant and state actor, he has not alleged or established a constitutional violation resulting from the conditions in Tent 3 in order to recover under § 1983.  Based on his assertion that he was not convicted and sentenced until November of

6

2013, the Court considers Selestan to have been a pretrial detainee for the majority of his term in Tent 3.

Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment while the Eighth Amendment provides protection to the convicted. *Zara v. Strain*, 458 F. App'x 393, 393-94 (5th Cir. 2012); *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir.1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979)). The distinction is primarily one of formality, however, because to determine whether a pretrial detainee's rights have been violated under the Fourteenth Amendment, the court applies an analysis identical to that applied in Eighth Amendment cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996). The plaintiff, therefore, must show that he was incarcerated under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his welfare or safety. *See Neals v. Norwood,* 59 F.3d 530, 533 (5th Cir. 1995).

The Eighth Amendment's prohibition on "cruel and unusual punishments" forbids conditions of confinement "which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society' ... or which 'involve the unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 102-103 (1976) (citations omitted). "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

As discussed previously, a state actor may be liable under § 1983 only if he "was personally involved in the acts causing the deprivation of his constitutional rights or a causal connection exists between an act of the official and the alleged constitutional violation." *Douthit*, 641 F.2d at 346.

7

Furthermore, the official must have acted with deliberate indifference to be liable under § 1983.  An official is deliberately indifferent to an inmate's health and safety in violation of the Eighth Amendment "only if he knows that the inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Jones v. Greninger*, 188 F.3d 322, 326 (5th Cir. 1999).  "Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of harm." *Thompson*, 245 F.3d at 459.  Whether pretrial or convicted, the plaintiff must prove facts sufficient to show "at a minimum, that the prison officials realized there was imminent danger and have refused – consciously refused, knowingly refuse – to do anything about it."  *Campbell v. Greer*, 831 F.2d 700, 702 (7th Cir. 1987).

### 1.     Replacement of the Air Filter

Piecing together Selestan's allegations, he complains that in June of 2010, shortly after he arrived at OPP, he noticed that the filters for the air conditioning system had not been changed under a time line he deemed appropriate.  He asserts that he complained about this and how the air and environment in the dormitory were dusty, which led him to suffer with sinus issues requiring medical care, as will be discussed later in this report.

The records confirm that on July 23, 2013, Selestan notified prison officials that the air conditioning filter needed to be changed in his area.[3]  His request was reported to maintenance.[4]

Selestan has not described or alleged a constitutional violation under these circumstances. He has not demonstrated any indifference to his safety or health, that he was intentionally placed

---

[3]Request for Service, 7/23/13.

[4]*Id*., response from Charles W. Ezeb dated 7/23/13.

in harm's way, or that he was intentionally exposed to harmful conditions sufficient to establish a violation of the Constitution. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (no constitutional injury when plaintiff was confined in "filthy" cell) (citing *Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996)). Selestan's request to have the air filter changed was addressed and responded to promptly by the prison staff. He has failed to state a non-frivolous claim or constitutional violation.

## 2.  Air Conditioner Off for Three Days

Selestan complains that the air conditioner was turned off by the prison maintenance staff which caused the floors to become wet. He complains that, as a result of this negligent act, he slipped and fell hurting his back. This allegation is factually inaccurate and frivolous.

The records reflect that around 11:21 a.m. on September 21, 2013, the air conditioner in Tent 3 broke and shutdown; it was not turned off by maintenance as alleged by Selestan.[5] The prison officials immediately began sending ice and fans to the area to attempt to cool the temperature.[6] That evening, while Deputy Gabriel continued to work on the air unit, the staff brought mops and buckets to the tier to use on the wet floor.[7] Floor fans were placed at the gates and in the module, with the front door left open to assist with air flow.[8] The guards even placed trash cans filled with

---

[5]Log Entry 9/21/13, 1122; Log Entry 9/22/13, 0702.

[6]Log Entries 9/21/13, 1403, 1857, 1934, 2016, 2100.

[7]Log Entry 9/21/13, 1857.

[8]Id.; Log Entry 9/22/13, 0702.

ice in front of the fans.[9]  Around midnight, the inmates were locked down to concentrate the air in the dayroom and the televisions were left on for the inmates convenience.[10]

These accommodations continued into the next two days, September 22 and 23, 2013, with additional ice provisions and (contrary to Selestan's suggestion) the opening of the rear door to allow for air flow.[11]  During this time, on September 22, 2013, the log records reflect that Selestan was escorted to the nursing staff at 9:30 p.m. but no reason is given for the visit.[12]

On the morning of September 23, 2013, the air conditioning maintenance crew, Deputies Barnes, Gabriel and Lewis, arrived on the tier to fix the system.[13]  The three men left the tier at 9:55 a.m. and the air conditioner was noted to be working.[14]

That same day, Selestan filed multiple requests for service to advise prison officials that he slipped and fell due to the condensation on the floor caused by the showers and the lack of air conditioning and that he needed medical attention.[15]  He was reminded that he already received medical attention and to file a sick call request if he needed follow-up care.[16]

As an initial matter, the records reflect that the air conditioning unit simply stopped working and was not accidentally turned off by the maintenance crew as Selestan would later suggest.  Either

---

[9]Log Entry 9/21/13, 2016.

[10]Log Entry 9/22/13, 0008.

[11]Log Entries 9/22/13, 0702, 1651, 1827; Log Entry 9/23/13, 0710.

[12]Log Entry 9/22/13, 2130.

[13]Log Entry 9/23/13, Note following the 0755 entry.

[14]*Id.*

[15]Request for Service, 9/23/13; Request for Service (2), 9/23/13.

[16]*Id.*, response from Jose Ham dated 10/24/13; Id., response from Earl Weaver Jr. dated 10/7/13.  His medical care for the alleged back injury will be discussed later in this report.

way, Selestan himself properly identifies the incident as an unintentional occurrence.  It is well settled, however, that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of [state] tort law." *Baker v. McCollan*, 443 U.S. 137, 146 (1979).  Thus, the Supreme Court has long held that § 1983 liability must be predicated on more than mere negligence which is not protected under due process considerations. *See Daniels v. Williams*, 443 U.S. 327, 328 (1986).

Neither Selestan nor the prison records reflect any intentional indifference to his safety or health when the air conditioner stopped working.  In fact, the records reflect that the prison guards, who were also working in the heat, attempted to accommodate the inmates and cool the tier with ice and fans and opened doors.  The records also indicate that mops were made available to ease the level of accumulated moisture on the floors.  Selestan's accidental fall was not caused by an indifference on the part of the prison officials but was just that, accidental.  He has not alleged a constitutional violation as a result of or cause for his fall.  This claim is frivolous.

### 3.      Leaking Plumbing and Insects

Selestan also complains that the pipes in the bathroom leaked and sewerage water, filled with insects he identifies as leeches, covered the floor and was tracked through the living area of Tent 3. He claims that this was an on-going problem that was virtually ignored by prison officials and which made his living conditions unbearable.

On October 28, 2013, Selestan submitted a request for service advising prison officials that raw sewage water was leaking from the pipes for the sink in the shower area.[17]  Complaints of the

---

[17]Request for Services, 10/28/13.

leak were noted in the tier logs on October 31, 2013.[18]  He complained again the next day and continued to do so almost daily into the month of November, 2013.[19]

On November 4, 2013, electricians and plumbers were on the tier for repair work.[20] Maintenance checked the problems in the shower area on November 11, 2013.[21]   The tier representative was given cleaning supplies and bleach "for leeches in the drains."[22]

The deputies also noted on the evening of November 12, 2013, that tree toilets were broken and the sink was leaking.[23]   Several days later, on the morning of November 16, 2013, an inmate brought a cup of "leeches" to show the deputy what was coming out of the drains.[24]   The deputy noted that, "maintenance and rank are aware of the leeches coming out of the drains.  Maintenance has been here recently to address the problem."[25]  The deputy requested bleach to pour in the drains. The next day, November 17, 2013, the restroom and shower area were sprayed.[26]

---

[18]Log Entry 10/31/13, 1134.

[19]Request for Services, 10/28/13 (Inmate Comment dated 10/29/30); Request for Service, 10/30/13; Request for Service (2), 10/30/13; Request for Service, 10/31/13; Request for Service (2), 11/1/13; Request for Service, 11/7/13; Request for Service, 11/8/13; Request for Service, 11/12/13; Request for Service (2), 11/12/13; Request for Service (2), 11/14/13; Request for Services, 11/17/13.

[20]Log Entry 11/4/13, 1330.

[21]Log Entries 11/11/13, 0832, 0838, 0936.

[22]Log Entry 11/11/13, 0838.

[23]Log Entry 11/12/13, 1841.

[24]Log Entry 11/16/13, 0837.

[25]*Id.*

[26]Log Entry 11/17/13, 1223.

Later that evening, the deputies log showed that there were five toilets broke.[27]  On the right side, two toilets were stopped up and one was "sprinkling water back up."  On the left side, one toilet was stopped up and one was "sprinkling water back up."  The shower drain was also stopped up and the middle sink was leaking water.[28]  The next morning, November 18, 2013, the plumbers arrived on the tier to fix the restrooms.[29]

No other problems were reported until December 14, 2013, when a tier representative notified the guard that one toilet was running continuously.[30]  On the morning of December 17, 2013, a maintenance deputy and two officers arrived on the tier with a Board of Health inspector.[31]  On December 18, 2013, a deputy noted in the log that the first toilet on the left was still running continuously, the same toilet first reported to maintenance on December 14, 2013.[32]

The conditions described by plaintiff, as confirmed in part by the prison logs and records, while plainly not comfortable or pleasant, do not rise to a level of seriousness constituting a constitutional violation.  Selestan has not alleged that he suffered a physical injury or illness as result of the malfunctioning plumbing or water.  He alleges only what can be described as mental anguish and discontent with the proximity of the water to his living and eating areas.  Thus, he alleges no serious harm or risk of serious harm in the constitutional sense.

---

[27]Log Entry 11/17/13, 1850.

[28]*Id.*

[29]Log Entry 11/18/13, 0825.

[30]Log Entry 12/14/13, 0702.

[31]Log Entry 12/17/13, 1048.

[32]Log Entry 12/18/13, 0737.

In addition, periodic and short term sanitation problems, although admittedly unpleasant, do not amount to constitutional violations. *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994); *Knop v. Johnson*, 977 F.2d 996, 1013 (6th Cir. 1992); *Robinson v. Ill. St. Corr. Ctr.*, 890 F. Supp. 715, 720 (N.D. Ill. 1995). "[J]ails must provide only reasonably adequate hygiene and sanitation conditions." *Burton v. Cameron County*, 884 F. Supp. 234, 241 (S.D. Tex. 1995) (citing *Green v. Ferrell*, 801 F.2d 765, 771 (5th Cir. 1986)); *accord Benshoof v. Layton*, No. 09-6044, 2009 WL 3438004, at *4 (10th Cir. Oct. 27, 2009); *Gates v. Cook*, 376 F.3d 323, 342 (5th Cir. 2004).

The federal courts have long recognized that serving time in prison "is not a guarantee that one will be safe from life's occasional inconveniences." *Holloway v. Gunnell*, 685 F.2d 150, 156 (5th Cir. 1982). The Courts also have repeatedly held "that the Constitution does not mandate prisons with comfortable surroundings or commodious conditions." *Talib*, 138 F.3d at 215 (citing *Rhodes*, 452 U.S. at 349); *accord Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).

Selestan's allegations about faulty and leaking plumbing, even with standing water on the floor, fail to establish constitutional violations. *See Smith*, 87 F.3d at 269 (no constitutional violation when prisoner was exposed for four days to raw sewage from overflowed toilet in his cell); *Davis v. St. Charles Parish Corr. Ctr.*, No. 10-98, 2010 WL 890980, at *9 (E.D. La. Mar. 8, 2010) (Lemmon, J.) (citing *Talib*, 138 F.3d at 215). "Simply because [plaintiff's] dorm is less sanitary than he would like does not render the conditions unconstitutional." *Wilson v. Lynaugh*, 878 F.2d 846, 849 & n.5 (5th Cir. 1989)) (inmate who complained of "unsanitary practice[s]," including inadequate ventilation, unsanitary water fountains, 52 inmates using one ice cooler, rest room four feet from the dining area, toilets leaking water and unsanitized living quarters, failed to state a claim.).

The temporary conditions endured by Selestan fall well short of the type of extreme, virtually permanent conditions found by the Fifth Circuit to violate the Constitution.  *See Harper*, 174 F.3d at 716 (finding unconstitutional "continual" conditions of "filthy, sometimes feces-smeared cells."); *Gates*, 376 F.3d at 338 (finding unconstitutional "'extremely filthy' [cells] with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls.").  When compared to the conditions considered by the Fifth Circuit in the foregoing cases, the sporadic and temporary unsanitary conditions described by Selestan do not rise to the level of a constitutional violation. The conditions he experienced in OPP Tent 3 were neither "virtually permanent" nor an extreme deprivation of the type that might offend the Constitution, and he suffered no physical injuries or serious ailments as a result of these allegedly unsanitary conditions.

### 4. Housed with Ill and "Detoxing" Inmates

Selestan presents a vague statement that he was housed with inmates who have contagious diseases and who are "detoxing" presumably from drug addictions.  Although he expresses no particular violation related to this fact, he also has failed to allege any actual physical injury or illness resulting from this non-specific exposure, a requirement for recovery under § 1983.  *See Jackson v. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993) (excessive force claim dismissed as frivolous when prisoner suffered no injury); *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990) (claims properly dismissed when plaintiff alleged insufficient causal connection between defendants' conduct and the claimed injury); *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 602 (5th Cir. 1988).

Selestan alleges no harm or risk of serious harm in the constitutional sense.  He has not alleged that he experienced any illness or any other kind of physical problem as a result of being

housed with ill or "detoxing" inmates.  Thus, he has not alleged sufficiently serious harm resulting from these problems to satisfy either the objective or subjective components required to state a claim for unconstitutional conditions of confinement.  His claims are therefore frivolous and otherwise fail to state a claim for which relief can be granted.

### 5. No Outdoor Exercise

Selestan also asserts that he was not given the proper amount or opportunity for outdoor exercise while in Tent 3.  His claim fails to state a cognizable Section 1983 claim of violation of his constitutional rights.

The records reflect that Selestan submitted one request for service on November 5, 2013, in which he claimed that he was not receiving adequate outdoor recreation, claiming that he had only been given three opportunities since his incarceration.[33]  He challenged the staff's suggestion that the recreation yard was undergoing maintenance.  His complaint was forwarded to the Warden who replied that the inmates were being taken on the yard.[34]

Once again, Selestan has not alleged that his limited outdoor exercise caused any serious health hazard.  This balled allegation is insufficient to establish either a substantial risk of serious harm or any actual injury.  *See Haralson v. Campuzano*, 356 F. App'x 692, 697 (5th Cir. 2009) (inmate who was denied out-of-cell exercise for seven months while in the prison infirmary failed to raise a genuine issue of material fact as to whether he suffered a serious injury sufficient to constitute an Eighth Amendment violation); *Hernandez*, 522 F.3d at 561 (no constitutional violation where there a lack of exercise did not pose a substantial risk of serious harm especially where the

---

[33]Request for Service (2), 11/5/13; Request for Service (3), 11/5/13.

[34]Request for Services (3), 11/5/13 (response from Russell Rhodes dated 12/6/13).

inmate did not suffer a serious illness or injury resulting therefrom.); *see also*, *Doolittle v. Holmes*, No. 06-986, 2010 WL 22552, *6 (M.D. La. Jan. 4, 2010) ("[A]lthough the plaintiff alleged in his Complaint that he suffered muscle atrophy as a result of his confinement for 2 1/2 months without exercise, there is no evidence to support this conclusory assertion.  The plaintiff has provided nothing to support his claim of muscle atrophy or to show its extent or duration," and his medical records revealed no complaints about muscle atrophy during the relevant time period.).  Selestan's claim of lack of outdoor exercise is frivolous.

### 6. **Armed Search by SID**

Selestan also complains that Security Investigation Division ("SID") officers entered Tent 3 armed with weapons and tear gas canisters to conduct a shakedown search and strip search of the inmates.  Selestan claims that he questioned the officers about the show of force and was told it was necessary because the officers were outnumbered 10 to 87.  His claims fails to assert a constitutional violation and is frivolous.

Although he does not indicate that date of this event, the tier logs show that several shakedowns were conducted while Selestan was in Tent 3.  On November 17, 2013, eight SID deputies entered the tier at 8:30 p.m. to conduct inmate searches and a shakedown (or search) of belongings.[35]  They left the tier at 10:00 p.m.[36]  A second shakedown was referenced to have occurred on November 23, 2013, and only two deputies were involved.[37]

---

[35]Log Entry 11/17/13, 2030.

[36]*Id*.

[37]Log Entry 11/23/13, 0900 (shakedown ended 0930).

The third and most likely reference occurred on November 29, 2013, at 9:00 a.m.[38]  This entry reflects that three security officers and other civil service deputies entered Tent 3 for a shakedown search.  It is also noted that during the strip search of inmates, Deputy Holiday confiscated $46.00 from an inmate.

Selestan does not allege any violation of a specific constitutional right or even suggest that the prison officials had no right to search his cell or his person.[39]  Selestan instead complains only that the security search was done by officers who were armed with weapons and gas canisters when they entered the tier to conduct the shakedown and strip searches.  His claim does not point to a constitutional violation.

The United States Supreme Court has "held that 'the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury.'"  *Wilkins v. Gaddy*, 599 U.S. 34, 34 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 4 (1992)).  In this case, Selestan does not actually allege a use of force against him; his claim instead is that the guards made a <u>show</u> of force by arming themselves with weapons before entering the tier.  However, carrying a gun or even pointing a gun at an inmate is not enough to state a claim of excessive force or violation of any other constitutional right.  *See Gonzales v. Flanagan*, 102 F.

---

[38]Log Entry 11/29/13, 0900.

[39]To do so would be a frivolous effort.  The Fifth Circuit recognizes that a prisoner only possesses a constitutional right to bodily privacy that "is minimal, at best."  *Oliver*, 276 F.3d at 745.  The inmate "loses those rights that are necessarily sacrificed to legitimate penological needs."  *Elliott v. Lynn*, 38 F.3d 188, 190-91 (5th Cir. 1994).  The reasonableness of cell and body searches is readily established, because "a prison administrator's decision and actions in the prison context are entitled to great deference from the courts."  *Id.*, at 191.  The United States Supreme Court has reiterated its long standing doctrine that the federal courts should defer to the "expert judgment" of prison officials in devising "reasonable search policies to detect and deter possession of contraband in their facilities."  *Florence v. Bd. of Chosen Freeholders of County of Burlington*, __ U.S. __, 132 S. Ct. 1510, 1517 (2012) (citing *Bell*, 441 U.S. at 546).  In *Bell*, the Supreme Court previously held that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional rights of both convicted prisoners and pretrial detainees."  *Bell*, 441 U.S. at 546.

App'x 404 (5th Cir. 2004) (officer's brandishing her weapon did not cause any injury to prisoner-plaintiff and did not amount to excessive force) (citing *Hinojosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1229-30 (5th Cir. 1988) (fear alone caused as a result of officer pointing gun at the plaintiff did not rise to the type of injury compensable under § 1983)).

In addition, any fear and distress resulting from Selestan being guarded by armed deputies is not compensable damages under § 1983. *Hinojosa*, 834 F.2d at 1229-30. Under 42 U.S.C. § 1997e(e), an inmate cannot recover for "mental and emotional injury suffered while in custody without a prior showing of physical injury." The United States Fifth Circuit has held that the phrase "physical injury" in § 1997e(e) means an injury that is more than *de minimis*, but it need not be significant. *Alexander v. Tippah County, Miss.*, 351 F.3d 626 (5th Cir. 2003) (quoting *Harper*, 174 F.3d at 719, quoting *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997), (where the Fifth Circuit first set forth its § 1997e(e) definition of physical injury)); *Jones*, 188 F.3d at 326. In this case, Selestan has not alleged any physical injury as a result of the search and this allegation is frivolous.

For all of the foregoing reasons, Selestan's claims challenging the conditions of his confinement are frivolous and otherwise fail to state a claim for which relief can be granted pursuant to 28 U.S.C. § 1915(e) and § 1915A, and 42 U.S.C. § 1997e.

### C.   <u>Adequate Medical Care</u>

Under a broad reading of his pleadings, Selestan alleges that the conditions of Tent 3 caused him temporary sinus problems from the dust and poor ventilation and on-going back pain as a result of his fall on the wet floor when the air conditioner was off for three days. He also suggests that his requests related to pain medication went ignored by the medical staff.

Having reviewed the prison records, it appears that each of Selestan's actual sick call requests were addressed by the medical staff.  In addition, Selestan chose to submit requests for service about his medical needs to the officials in Tent 3 and failed to abide by their instructions and the prison policy requiring that his requests for medical care be submitted on sick call request forms, as shown in the following summary.

The medical records reflect that, on July 29, 2013, which was about one week after he complained about the air filters, Selestan submitted a sick call request complaining of sinus congestion or a head cold.[40]  He was examined by the nurse practitioner on August 9, 2013, for complaints of allergy symptoms including runny nose, sneezing, watery eyes, headache, infrequent cough, and post-nasal drip.[41]  He was diagnosed with seasonal allergies and prescribed loratadine,[42] ibuprofin,[43] and guaifenesin[44] for ten days.

When he was brought back for a follow-up visit on August 30, 2013, he reported to the nurse practitioner that his allergy symptoms had improved and no further treatment was deemed necessary

---

[40]Sick Call Request, 7/29/13.

[41]Provider Note/Orders, 8/9/13.

[42]Loratadine, the generic name for Claritin, is a long-acting, non-sedating antihistamine that is used for the treatment of allergies and sold under the brand names.  http://www.medicinenet.com/loratadine/article.htm.

[43]Ibuprofen, the generic name for Advil and Motrin, belongs to a class of drugs called nonsteroidal anti-inflammatory drugs used in the management of mild to moderate pain, fever, and inflammation. http://www.medicinenet.com/ibuprofen/article.htm.

[44]Guaifenesin, the generic name for Mucinex, is an expectorant medication that promotes elimination of mucus from the lungs.  http://www.medicinenet.com/guaifenesin/article.htm.

for those symptoms.[45]  His chest x-ray was also reported to be normal.[46]  Selestan did not submit any other sick call requests about allergy symptoms.

Selestan later submitted a sick call request on September 23, 2013, complaining that he had fallen the day before in the shower and hurt his back.[47]  He was referred, by the nurse, to the nurse practitioner and was examined by the nurse practitioner on September 30, 2013.[48]  At that visit, he also requested for the first time that his sinus medication be renewed.  He was prescribed tramadol[49] for pain for ten days, loratadine for ten days for allergy symptoms, and indomethacin[50] for pain for thirty days to begin after the tramadol ended, and was scheduled for x-rays of his back.[51]  The x-rays were reported to be abnormal, not due to any acute or current findings related to his fall, but instead due to scoliosis and mild degenerative changes.[52]  Selestan did not submit any other sick call requests related to his back or allergy symptoms.

Instead, he submitted a continuous flow of almost daily requests for service to the prison guards in Tent 3 asking for pain medication (or different pain medication) and for medical attention

---

[45]Provider Note/Orders, 8/30/13.

[46]X-ray Report, 8/20/13.

[47]Sick Call Request, 9/23/12.

[48]Sick Call Request, 9/30/13.

[49]Tramadol, the generic name for Ultram, is a man-made or synthetic narcotic-like analgesic used for pain relief. http://www.medicinenet.com/tramadol/article.htm.

[50]Indomethacin is a nonsteroidal anti-inflammatory drug that reduces fever, pain, and inflammation and is similar to ibuprofen (Motrin) and naproxen (Naprosyn, Aleve). http://www.medicinenet.com/indomethacin/article.htm.

[51]Sick Call Request, 9/30/13.

[52]X-ray Report, 10/8/13.

for his back.[53]  In response to these requests for service, Selestan was repeatedly advised to file sick call requests with the medical department.[54]

On October 21, 2013, Selestan filed a request for service demanding that he be given additional testing on his back, such as a CT scan or MRI, to determine soft tissue injury because of numbness in his legs radiating from his back.[55]  He was again directed to submit a sick call request to the medical staff if he needed additional medical care.[56]  He did not submit a sick call request.

Nevertheless, on October 22, 2013, in response to his requests for services that was found to be grievable, Selestan was examined at the prison by Dr. Herman Gonzales for his continued complaints of back pain.[57]  The doctor diagnosed Selestan with lower back pain secondary to scoliosis exacerbated by trauma and controlled by medication.

Several days later, on October 25, 2013, Selestan began to file requests for service with the prison officials threatening to file a lawsuit about his back injury and made demands for monetary settlements from the prison officials through the request for services process.[58]  Selestan was advised that his demand had to be presented to Major Jenkins rather than the ranking officers at Tent 3.[59]

---

[53]Request for Service, 10/12/13 with "inmate comments" attached dated 10/26/13, 10/30/13, 10/31/13, 11/1/13, 11/3/13.

[54]*Id.*, response from Jose Ham dated 12/13/13.

[55]Request for Service (3), 10/25/13.

[56]Request for Service (3), 10/25/13 (response from Jose Ham dated 12/12/13).

[57]Provider Note/Orders, 10/22/13.

[58]Request for Service, 10/25/13; Request for Service (2), 10/25/13; Request for Service (3), 10/25/13.

[59]Request for Service (2), 10/25/13 (response from Emanuel Hudson dated 10/30/13).

Over the next several weeks, Selestan continued to request a change of medication or additional medication to ease his back pain.[60] During that time, he was seen by the nurse practitioner on November 8, 2013, and naprosyn was reordered.[61]  When she saw him again on December 12, 2013, she reordered naprosyn, neurontin,[62] and an topical analgesic balm for his back.  She also advised Selestan to exercise by stretching.[63]

Claims of deliberate indifference by prison personnel to a prisoner's serious medical needs is actionable under § 1983.  *Estelle*, 429 U.S. at 104-105.  "A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  *Gobert*, 463 F.3d at 345 n.12; *Lewis v. Evans*, 40 F. App'x 263, 264 (5th Cir. 2011).  As noted above, a prison official is deliberately indifferent if he or she has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk.  *Farmer*, 511 U.S. at 847; *see also Parrish v. Cleveland*, 372 F.3d 294, 302 (4th Cir.2004) (the standard of deliberate indifference requires actual knowledge and disregard of a substantial risk of serious injury); *Washington v. La Porte County Sheriff's Dep't*, 306 F.3d 515 (7th Cir. 2002) (same).

Under *Estelle*, deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary wanton infliction of pain," proscribed by the Eighth Amendment.  *Estelle*, 429 U.S. at 104.  This is true where the indifference is manifested by prison officials or prison healthcare

---

[60]Request for Service, 11/2/13; Request for Service, 11/4/13; Request for Service, 11/7/13

[61]Provider Note/Orders, 11/8/13.

[62]Neurontin, a brand name for gabapentin, is used with other medications to prevent and control seizures and relieve nerve pain following shingles in adults.  http://www.medicinenet.com/gabapentin-oral/article.htm.

[63]Provider Note/Orders, 12/12/13.

providers in their response to the prisoner's needs or in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. *Id.*

However, a prisoner's mere disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs. *Gobert*, 463 F.3d at 346; *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001); *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997). Therefore, inadequate medical treatment of inmates, at a certain point, may rise to the level of a constitutional violation, while malpractice or negligent care does not. *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action."); *Williams v. Treen*, 671 F.2d 892, 901 (5th Cir. 1982) ("mere negligence in giving or failing to supply medical treatment would not support an action under Section 1983."); *see also Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).

In this case, the records reflect that each of Selestan's sick call requests related to his allergy and back complaints were promptly addressed by the prison medical staff. He was also taken for regular follow-up visits without any indication that he filed a sick call request. It is apparent that Selestan knew how to complete sick call requests and instead chose to pursue relief through the requests for service to the Sheriff's Office (not the medical department) and apparently ignored the deputies' instructions to file sick call requests if he needed additional care and medication. Because he did not do so, he can not establish that any of the medical personnel were deliberately indifferent to a known and serious condition or illness reported to the medical department.

His claims were not ignored and instead were met with examination and necessary medication. When Selestan was examined on follow-up visits by the nurse practitioner and the

doctor, he was provided medication for the symptoms he was exhibiting at that time.  This included alterations in the prescribed medication in effort to comfort his pain.  Nothing alleged by Selestan to this Court or shown in the medical records would establish that the prison or medical personnel were indifferent to his serious medical needs.

For these reasons, Selestan's medical indifference claims are frivolous and otherwise fail to state a claim for which relief can be granted under § 1915, § 1915A, and § 1997e.

### D.    Delayed Release

Finally, Selestan complains that the Sheriff's Office failed to release him when he was sentenced to probation in November of 2013 and instead unlawfully held him until late December of 2013 before he was released.  He claims that this amounted to false imprisonment.  Since he was incarcerated when the suit was filed, he sought both monetary relief and his immediate release.

As background, on November 27, 2013, Selestan began to submit requests for service indicating that he was supposed to have been released after his court appearance on November 26, 2013.[64]  Each of his requests and addendums thereto were responded to by the prison staff indicating that Selestan had not been cleared for release by the Louisiana Department of Corrections ("DOC") and/or the probation office.[65]  Refusing to believe the officials, Selestan even caused a disturbance on the tier on December 4, 2013, which required several deputies to respond to the incident.[66]

---

[64]Request for Service, 11/27/13; Request for Service (2), 11/27/13; Request for Service, 11/28/13; Request for Service, 11/29/13; Request for Service, 12/2/13; Request for Service (2), 12/3/13; Request for Service, 12/11/13; Request for Services, 12/16/13; Request for Service, 12/17/13; Request for Service, 12/18/13.

[65]Request for Service, 11/27/13 (response from Darlena Cole dated 12/14/13); Request for Service, 11/28/13 (response from Emanuel Hudson dated 12/2/13); Request for Service, 11/29/13 (response from Kaja Harrell dated 12/10/13).

[66]Log Entry 12/4/13, 0918.

Nevertheless, he was notified as early as December 10, 2013, that he was not released by the state court on November 26, 2013, and was instead <u>sentenced</u> to five months in the custody of the DOC.[67]  Selestan also conceded to prison officials in his written requests that he was subject to a traffic warrant issued by the Gretna Police Department which impacted his release date.[68]  He also indicated that he was aware that the Gretna Police Department had not sent paperwork to the prison to effectuate his release.[69]  He was told by prison officials that, when all of the paperwork arrived and he completed the balance of his five month sentence (with credit for time served), he would be released.[70]  The records reflect that Selestan was escorted off of the tier for his discharge and release at 2:49 p.m. on December 18, 2013.[71]

Selestan's claims fail to state a cognizable claim under § 1983 and for the following reasons his claims are barred from federal review at this time.  It is well settled that, before a plaintiff can proceed under § 1983 on a claim that challenges a conviction or his detention, he must show that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994); *see also Jackson*, 49 F.3d at 177.

---

[67]Request for Service, 11/29/13 (response from Kaja Harrell dated 12/10/13); Request for Service, 12/2/13 (response from Roy Austin, 12/13/13); Request for Service (2), 12/3/13 (response from Roy Austin dated 12/12/13).

[68]Request for Service, 12/3/13; Request for Service (4), 12/3/13; Request for Service, 12/5/13.

[69]Request for Service (4), 12/3/13; Request for Service, 12/5/13; Request for Service, 12/10/13.

[70]Request for Service, 12/5/13 (response from Russell Rhodes dated 12/5/13).

[71]Log Entry 12/18/13, 1449.

In *Heck*, the Supreme Court held that a claim under § 1983 is barred if success in the suit would necessarily imply the invalidity of an outstanding criminal conviction or a plaintiff's confinement. This limitation avoids collateral attacks on convictions that are still outstanding. *Heck*, 512 U.S. at 484-85. Although the Supreme Court's decision in *Heck* concerned a civil action for monetary damages, the United States Court of Appeals for the Fifth Circuit has also applied *Heck* in cases in which the plaintiff also seeks injunctive relief. *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998) (*en banc*) (citing *Edwards v. Balisok*, 520 U.S. 641 (1997)).

The doctrine in *Heck* would prevent this Court from considering Selestan's challenge to the calculation and length of his incarceration. His claims directly challenges the validity of his confinement between November 26, 2013 and December 18, 2013. The Supreme Court has explained that, "a state prisoner's § 1983 action is barred (absent prior invalidation)-no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)-if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005). That is exactly what Selestan asks this Court to do and the claim is barred.

In addition, Selestan was in prison when he filed this complaint and, as such, he requested that he be immediately released from prison. That request, however, would be within the ambit of a federal court's habeas corpus authority. *Muhammad v. Close*, 540 U.S. 749, 750 (2004). A § 1983 civil rights proceeding is not the appropriate means of pursuing that type of relief. *Id.*; *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973); *Hernandez v. Livingston*, 495 F. App'x 414, 417 (5th Cir. 2012); *Hernandez v. Spencer*, 780 F.2d 504, 504 (5th Cir. 1986). Selestan would have to pursue any such habeas corpus relief in a properly filed state or federal post-conviction proceeding as would

be available and appropriate. *See Kennedy v. St. of Tex. Pardons and Parole*, 136 F. App'x 712, 713 (5th Cir. 2005) (citing *Wilkinson*, 544 U.S. at 74); *Preiser*, 411 U.S. at 500 ("when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus.")

For all of these reasons, any § 1983 claims by Selestan challenging the length of his confinement are barred and must be dismissed under *Heck* with prejudice to their being asserted again until the *Heck* conditions are met. *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir.1996).

## IV.   Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Selestan's § 1983 claims against the defendant, Orleans Parish Sheriff Marlin N. Gusman, and the various conditions of confinement claims be **DISMISSED WITH PREJUDICE** as frivolous and otherwise for failure to state a claim for which relief can be granted in accordance with 28 U.S.C. § 1915(e) and § 1915A and 42 U.S.C. § 1997e and the § 1983 claims specifically challenging the length of his confinement additionally be barred until such time as the *Heck* conditions are met.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[72]

New Orleans, Louisiana, this day of 21st of September, 2015.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[72]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.